# United States District Court

**CENTRAL** _____ **DISTRICT OF** _____ **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

| | |
|---|---|
| **ALL FUNDS IN BANK OF THE WEST ACCOUNT NUMBER 064155682; AND ALL FUNDS IN BANK OF THE WEST ACCOUNT NUMBER 062450531** | **APPLICATION AND AFFIDAVIT FOR A SEIZURE WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**<br><br>**CASE NO:  2:21-MJ-319** |

I, **Justin Palmerton,** being duly sworn depose and say:

I am a Special Agent with the <u>FEDERAL BUREAU OF INVESTIGATION</u>, and have reason to believe that in the _____ CENTRAL _____ District of _____ CALIFORNIA _____ there is now concealed a certain person or property, namely (describe the person or property to be seized)

which is (state one or more bases for seizure under United States Code)

All Funds in Bank of The West Account Number 064155682; and All Funds in Bank of The West Account Number 062450531

subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C), (b), §§ 982(a)(7), (b)(1), and § 984, and 21 U.S.C. § 853(f)

concerning a violation of Title _18_ United States Code, Section(s) § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud), both of which are specified unlawful activities as defined in 18 U.S.C. §§ 1956(c)(7) and (a)(1)(B)(i) or are traceable to such property, which is a specified unlawful activity as defined in 18 U.S.. § 1961(1)(B).  To the extent that the Subject Funds are not the actual monies traceable to or involved in the illegal activities identified herein, the government alleges that these funds are identical property found in the same subject account(s) as the property traceable to or involved in the illegal activities, rendering them subject to forfeiture pursuant to U.S.C. § 984.

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**
**Continued on the attached sheet and made a part hereof.     _X_ Yes _ No**

_____
**Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone**

**Sworn to before me in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone**

_____
**Date**

Los Angeles, California
_____
**City and State**

Hon. , Alka Sagar, U. S. Magistrate Judge
_____
**Name and Title of Judicial Officer**

_____
**Signature of Judicial Officer**

AUSA Brent Whittlesey:smb

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Justin Palmerton, being duly sworn, declare and state as follows:

### I.   INTRODUCTORY INFORMATION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2018.  I am currently assigned to a Los Angeles Field Division White Collar Crimes Squad, which is responsible for investigating complex financial crimes.  Prior to being employed by the FBI as a Special Agent, I was employed as a Certified Public Accountant at a public accounting firm.  My roles and responsibilities included financial statement audits, tax return preparation, and accounting consulting work.

2.    Since becoming an FBI Special Agent in 2018, I have received 21 weeks of formal training at the FBI Training Academy in Quantico, Virginia.  During the time I have been employed by the FBI, I have participated in investigations relating to wire fraud, mail fraud, and various types of complex financial crimes.  I have participated in many aspects of criminal investigations to include reviewing evidence, analyzing financial documents, conducting physical and electronic surveillance, working with informants, interviewing witnesses and subjects of investigations, and executing search and arrest warrants.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, documents and records that were collected and reviewed in the course of

1

this investigation, information that was obtained from interviewed witnesses, and information gathered by other law enforcement officers.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. PURPOSE OF AFFIDAVIT

This affidavit is made in support of an application for a warrant to seize the following funds on deposit in the following bank accounts (collectively referred to as "SUBJECT ACCOUNTS"):

a. All funds in Bank of the West account number 064155682, held in the name of Proactive Home Health Care Inc. ("SUBJECT ACCOUNT 1"), and

b. All Funds in Bank of the West account number 062450531, held in the name of Tamara Dadyan ("SUBJECT ACCOUNT 2").[1]

4.   The funds in the SUBJECT ACCOUNTS (the "SUBJECT FUNDS") are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and (b) because there is probable cause to believe that said funds constitute or were derived from proceeds

---

[1] Pursuant to Local Rule 7-17 plaintiff United States of America states that it filed an application for issuance of a seizure warrant for Subject Accounts 1 and 2 on January 13, 2021, Case No. 21-mj-193, and an amended application for issuance of a seizure warrant on January 15, 2021.  The Honorable Jean Rosenbluth, United States Magistrate Judge, declined to issue the seizure warrant for Subject Accounts 1 and 2.

traceable to one or more violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud), both of which are specified unlawful activities as defined in 18 U.S.C. § 1956(c)(7), and traceable to a violation of 18 U.S.C. § 1956 (a)(1)(B)(i) (money laundering concealment), which is a specified unlawful activity as defined in 18 U.S.C. § 1961(1)(B).  Specifically, probable cause exists that the SUBJECT FUNDS represent proceeds from a fraud scheme by which RICHARD AYVAZYAN ("R. AYVAZYAN"), MARIETTA TERABELIAN ("TERABELIAN"), Arthur AYVAZYAN ("A. AYVAZYAN"), TAMARA DADYAN ("DADYAN") and others known and unknown, knowingly submitted or caused others to submit fraudulent loan applications to various lenders, including federally insured financial institutions, and the Small Business Administration ("SBA"), in an attempt to obtain funds authorized by the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.  Based on these fraudulent loan applications, funds were then wired to numerous accounts and were deposited either directly, or indirectly through transfers, into the SUBJECT ACCOUNTS which are associated with DADYAN.

5.   To the extent that the SUBJECT FUNDS are not the actual monies traceable to or involved in the illegal activities identified herein, there is probable cause to believe that said funds are identical property found in the same account as the property involved in the illegal activities, rendering them funds subject to forfeiture pursuant to 18 U.S.C. § 984.

6.   In addition, the SUBJECT FUNDS are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. §

982(a)(7) and (b)(1), and 21 U.S.C. § 853(f), because there is probable cause to believe that the SUBJECT FUNDS would, in the event of conviction on the alleged underlying wire fraud and bank fraud offenses, be subject to forfeiture, and an order under 21 U.S.C. § 853(e)(providing for restraining orders and injunctions) would not be sufficient to assure the availability of the property for forfeiture.

7.    On November 3, 2020, the Honorable Alka Sagar, United States Magistrate Judge, issued 11 search warrants, one of which was for the residence of Arthur Ayvazyan and Tamara Dadyan located at 17450 Weddington Street Encino, California, Case No. 2:20-MJ-05286.  That warrant was issued in connection with my investigation of the offenses described in this affidavit.  On the same date, Magistrate Judge Sagar approved a criminal complaint charging Arthur Ayvazyan and Tamara Dadyan with conspiracy to commit wire fraud and bank fraud in violation of 18 U.S.C. § 1349, Case No. 2:2-MJ-05321.

### III.  BACKGROUND

8.    Based on my training and experience, review of publicly available information, and discussions with other law enforcement agents, I have learned the following regarding the loans at issue.

### The Paycheck Protection Program ("PPP")

9.    The CARES Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of

relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP.  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

10.  In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

11.  A PPP loan application must be processed by a participating lender.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.  Specifically, the lenders enter the PPP application information into the SBA E-Tran system.  The E-Tran computer server is located in Herndon, Virginia.  If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies,

which are 100% guaranteed by the SBA.  The SBA is a United States government agency based in Washington, D.C.

12.  PPP loan proceeds must be used by the business on certain permissible expenses, e.g., payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

**The Economic Injury Disaster Loan ("EIDL") Program**

13.  The EIDL program is an SBA program that provides low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

14.  The CARES Act authorized the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL.  The amount of the advance is determined by the number of employees the applicant certifies having.  The advances do not have to be repaid.

15.  In order to obtain an EIDL and advance, a qualifying business must submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period

preceding the disaster.  In the case of EIDLs for COVID-19
relief, the 12-month period was that preceding January 31, 2020.
The applicant must also certify that all of the information in
the application is true and correct to the best of the
applicant's knowledge.

16.  EIDL applications are submitted directly to the SBA
and processed by the agency with support from a government
contractor.  The amount of the loan, if the application is
approved, is determined based, in part, on the information
provided by the application about employment, revenue, and cost
of goods, as described above.  Any funds issued under an EIDL or
advance are issued directly by the SBA.  EIDL funds can be used
for payroll expenses, sick leave, production costs, and business
obligations, such as debts, rent, and mortgage payments.  If the
applicant also obtains a loan under the PPP, the EIDL funds
cannot be used for the same purpose as the PPP funds.

### IV. FACTS SUPPORTING PROBABLE CAUSE FOR SEIZURE

**Summary of Scheme**

17.  Beginning in or around March 2020 and continuing
through at least in or around July 2020, R. AYVAZYAN,
TERABELIAN, A. AYVAZYAN, DADYAN and others known and unknown,
knowingly submitted or caused others to submit fraudulent loan
applications in the names of numerous business entities to
various lenders, including federally insured financial
institutions, and the SBA, and in turn, received proceeds from
disaster loans authorized by the CARES Act.  Among other things,
the fraudulent loan applications included material

7

misrepresentations about the applicant's payroll, payroll taxes, number of employees, and income.  Once the funds were received, in some instances, disaster loan proceeds were used to purchase residential properties.  Using disaster loan proceeds as part of a down payment on a residence for an individual's personal benefit is also fraudulent and violates the requirements for the PPP and EIDL.

**November 17, 2020 Indictment**

18.  On November 17, 2020, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN were indicted by a federal grand jury in the Central District of California for violations of 18 U.S.C. § 1349 (conspiracy to commit bank fraud and wire fraud); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1344(2) (bank fraud), in United States v. Ayvazyan et al, No. 2:20-CR-00579-SVW.  R. AYVAZYAN was also indicted for violation of 18 U.S.C. § 1028A (aggravated identity theft). According to the indictment, beginning no later than in or around March 2020 and continuing until at least in or around July 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN conspired with one another and with others known and unknown, to commit wire fraud and bank fraud.  Specifically, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, and other known and unknown conspirators, carried out the objects of the conspiracy, in substance, in the following manner:

a.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, used and caused

to be used, stolen, fictitious, or synthetic identities of individuals to submit fraudulent applications for PPP and EIDL loans;

b.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would use, and cause to be used, stolen, fictitious, and synthetic business names to submit fraudulent applications for PPP and EIDL loans;

c.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would make, and cause to be made, false statements to the SBA and financial institutions in connection with the fraudulent applications for PPP and EIDL loans, including false representations regarding the number of employees to whom the companies had paid wages and false certifications that the loans would be used for permissible business purposes.

d.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would electronically submit, and cause to be submitted, false and fictitious documents to the SBA and financial institutions in support of the fraudulent PPP and EIDL loan applications, including false or fictitious tax documents, payroll records, bank records, and identification documents.

e.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would direct that PPP and EIDL loan proceeds be deposited into bank accounts that defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, and their coconspirators controlled.

    f.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would use the fraudulently obtained PPP and EIDL loan proceeds for their own personal benefit and for the benefit of their coconspirators, including for expenses prohibited under the requirements of the PPP and EIDL programs, such as the purchase of a residential property in Tarzana, California, and a residential property in Glendale, California.

    19.   As part of the conspiracy, between in or around March 2020 and in or around July 2020, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, submitted and caused the submission of at least 35 fraudulent PPP and EIDL loan applications seeking a total of at least $5.6 million in PPP and EIDL proceeds from the SBA and financial institutions and received a total of at least $4.6 million in PPP and EIDL loan proceeds from the SBA and financial institutions.

**New Acre Farm Produce Inc. ("New Acre") fraudulent loan application – funds transferred in part to SUBJECT ACCOUNT 1**

    20.   New Acre applied for a PPP loan through Cross River Bank ("Cross River") on or about June 9, 2020. The applicant and owner was listed as Thanh P Tran. On or about July 1, 2020, the loan was approved by Cross River and $210,000 was disbursed to an account at Wells Fargo Bank ("WFB") in the name of New Acre ending x5076 ("WFB New Acre x5076"). The government's investigation has revealed that the PPP application contained numerous false and fraudulent representations. For example:

a.   New Acre represented to Cross River that it had approximately $1,526,000 in Annual Revenue. According to the web-site for Dun and Bradstreet, www.dnb.com, New Acre has an estimated annual revenue of $39,710 and one employee.  Dun and Bradstreet is a company that provides its customers commercial data, analytics, and insights for businesses.  As part of their business, they collect private company financials, and have collected financials for over 23 million companies worldwide.

b.   In support of its application, New Acre provided 2019 IRS Forms 940 and  941 that represented that New Acre it had approximately 12 employees and that its payroll costs for 2019 were $888,000. The IRS, however, has provided information that New Acre did not file any 2019 IRS Forms 940 or 941.

c.   I reviewed certified records from the California Franchise Tax Board ("CA FTB") and learned that the 2018 tax return listed New Acre as receiving $62,150 in Gross Revenues with $121,820 of deductions for a Net Loss of $59,670. None of the deductions included payroll expense. Additionally, CA FTB did not find any records for a 2019 tax return being filed.

21.  In December 2020, Law enforcement interviewed Thanh P Tran's spouse, Vivian Tran ("Vivian") and learned that Vivian's husband had recently passed away and that Vivian and Thanh P Tran knew A. AYVAZYAN and DADYAN. Vivian and Thanh P Tran knew A. AYVAZYAN and DADYAN from a nail salon they had owned previously. A. AYVAZYAN and DADYAN purportedly helped Vivian and Thanh P Tran by explaining documents to them as English was their second language. Vivian first became aware that New Acre

11

had applied for a PPP loan when right after her husband's death, A. AYVAZYAN asked her if Thanh P Tran had received the PPP funds yet.

22.   The government's investigation has revealed that Thanh P Tran passed away on or about October 18, 2020. Thanh P Tran's death is currently under investigation by the Riverside Sheriff's Office as a suspected homicide.

23.   Law enforcement reviewed documents seized during a search of A.AYVAZYAN and DADYAN's residence and found the following:

    a.   Blank checks from WFB New Acre x5076 that appear to be signed by Thanh P Tran.

    b.   Handwritten notes that state "Fix W2 Heros/ABC Legal Tran 940/941…"

24.   Investigators obtained and reviewed records from WFB for WFB New Acre x5076.  The account was opened on or about July 31, 2018, with Nhut Minh Quach ("Quach") and Thanh P Tran listed as the company's owners with control of the entity and the only signers on the account.  On May 20, 2019, Quach was removed from the account.  On July 2, 2020, the account had a balance of $6.92.  On July 3, 2020, $210,000 was deposited from the SBA. No other deposits were made into the account, before, on that same day, the account wired $73,500 to an account at Bank of America ("BOA") in the name of Runyan Tax Service Inc. ("Runyan Tax") ending x9700 ("BOA Runyan Tax x9700").  Investigators determined the deposit from the SBA was the loan proceeds for the fraudulently obtained New Acre EIDL loan described above.

Based on the account balance before the deposit from the SBA, and the fact that no other deposits came into the account before wiring $73,500 to BOA Runyan x9700, virtually all of the $73,500 wired to BOA Runyan x9700 came from the fraudulently obtained New Acre EIDL Loan.

25.  BOA Runyan x9700 was subject to a seizure warrant associated with this investigation filed in United States v. Ayvazyan et al, No. 2:20-MJ-05842, and signed December 2, 2020. The affidavit for this seizure warrant described how this account was opened on or about June 22, 2020, with Viktoria Kauichko, a known alias for TERABELIAN, listed as the company's CEO, Secretary and the sole signer on the account.  On or about July 21, 2020, the account received proceeds of a fraudulently obtained PPP loan in the name of Runyan.

26.  Prior to the seizure of funds in BOA Runyan x9700, on July 3, 2020, BOA Runyan x9700 received the $73,500 from WFB New Acre x5076.  After receiving the $73,500 but before the seizure of the funds in BOA Runyan x9700, on July 20, 2020, BOA Runyan x9700 had check 1008 clear in the amount of $96,875, made payable to PRO ACTIVE HOME HEALTHCARE, which was deposited into SUBJECT ACCOUNT 1.  BOA Runyan x9700 had an account balance of $100 before the $73,500 deposit, plus additional funds of $ $179,881.60 deposited into it from other sources ($199,881.60 of actual deposits but $20,000 came from funds from this account which were transferred to a savings account and then transferred back to this account) before check 1008 cleared.

**Voyage Limo LLC ("Voyage Limo") fraudulent loan application –
funds transferred in part to SUBJECT ACCOUNT 1**

27.   Voyage Limo applied for a PPP loan on or about May 14, 2020 through Celtic Bank. The applicant and owner was listed as Vahe Dadyan, who is known to investigators as a cousin of DADYAN. On or about May 20, 2020, Celtic Bank approved the loan and wired $157,500 to an account at WFB in the name of Voyage Limo ending x7900 ("WFB Voyage Limo x7900"). The government's investigation has revealed that the PPP application contained numerous false and fraudulent representations. For example:

a.   Voyage Limo represented to have annual revenues of $1,300,000. I reviewed records provided by the CA FTB and learned that Voyage Limo prepared 2015, 2018 and 2019 California tax returns. For each tax return there were no revenues recorded.

b.   Voyage Limo represented to have 11 individuals employed with average monthly payroll of $63,000. I reviewed records provided by CA FTB and learned that there were no payroll expenses listed for any of the tax returns on record.

28.   Investigators obtained and reviewed records from WFB for WFB Voyage Limo x7900.  The account was opened on or about August 20, 2019 with Vahe Dadyan listed as the company's Owner with control of the entity and was the sole signer. The account had a balance of $418.55 on May 19, 2020.  On May 20, 2020, the account had a deposit of $157,500 from Celtic Bank.  The government's investigation determined this was the loan proceeds for the fraudulently obtained Voyage Limo PPP loan described

above.  No other deposits were made into the account before July 3, 2020, at which time the account wired $155,000 to BOA Runyan x9700.  The government's investigation determined the deposit from Celtic Bank was the loan proceeds for the fraudulently obtained Voyage Limo PPP loan described above.  Based on the account balance before the deposit from the loan, and the fact that no other deposits came into the account before wiring $155,000 to BOA Runyan x9700,  virtually all of the $155,000 wired to BOA Runyan x9700 came from the fraudulently obtained Voyage Limo PPP Loan.

29.  As previously detailed, BOA Runyan x9700, associated with TERABELIAN, was subject to a seizure warrant associated with this investigation filed in United States v. Ayvazyan et al, No. 2:20-MJ-05842, and signed December 2, 2020.  Prior to the seizure of funds in BOA Runyan x9700, on July 3, 2020 BOA Runyan x9700 received the $155,000 from WFB Voyage Limo x7900 which investigation determined to be proceeds of a fraudulently obtained PPP loan.  As previously discussed, on July 3, 2020, BOA Runyan x9700 also received $73,500 from WFB New Acre x5076, which were also determined to be proceeds of the loan fraud scheme which is subject of this affidavit.

30.  After receiving the $155,000 but before the seizure of the funds in BOA Runyan x9700, on July 20, 2020 BOA Runyan x9700 had check 1008 clear in the amount of $96,875, made payable to PRO ACTIVE HOME HEALTHCARE, which was deposited into SUBJECT ACCOUNT 1.  BOA Runyan x9700 had an account balance of $100 before the $155,000 deposit, plus additional funds of $

15

$98,381.60 deposited into it from other sources ($118,381.60 of actual deposits but $20,000 came from funds which were transferred from this account to a savings account and then transferred back to this account) before check 1008 cleared.

**EM Construction fraudulent loan application – funds transferred in part to SUBJECT ACCOUNT 1**

31.   EM Construction applied for an EIDL loan on or about March 30, 2020. The applicant was listed as Artem Zherdov and claimed to be the sole owner of EM Construction. On or about May 19, 2020, the SBA approved the EIDL loan and wired $113,900 to an account at WFB in the name of EM Construction ending x1845 ("WFB EM Construction x1845"). The government's investigation has revealed that the EIDL application contained numerous false and fraudulent representations. For example:

a.   Law enforcement reviewed databases and determined that Artem Zherdov does not have a California driver license and is believed to be a synthetic identity created to hide the identity of the loan recipient.

b.   EM Construction represented to be in operation since September 1, 2013. I reviewed publicly available records from the California Secretary of State and could not find a record of an EM Construction owned by an Artem Zherdov.

c.   EM Construction represented to have an EIN of 17-7863652. This is the purported Social Security Number ("SSN") for Artem Zherdov. I know that if a business pays employees it must have an EIN issued by the IRS and cannot use an SSN to properly file payroll forms with the IRS. The IRS has provided

that the EIN listed on the application does not exist and does not have a record of EM Construction filing any IRS 940 or 941 forms.

32.  Law enforcement reviewed documents seized during a search of A. AYVAZYAN and DADYAN's residence and found a blank checkbook bearing the name Artem Zherdov. I believe this indicates A. AYVAZYAN and DADYAN have control over accounts in the name of Artem Zherdov.

33.  EM Construction applied for an EIDL loan on or about July 5, 2020. The applicant was listed as Em Phoeur and claimed to be the sole owner of EM Construction. On or about July 27, 2020, the SBA approved the EIDL loan and wired $150,000 to WFB EM Construction x1845. The government's investigation has revealed that the EIDL application contained numerous false and fraudulent representations. For example:

a.  EM Construction represented to have been operation since May 14, 1996. I reviewed publicly available records from the California Secretary of State and could not find a record of an EM Construction owned by an Em Phoeur. I reviewed open source databases and learned that Em Phoeur had a California contractor license that expired May 31, 2002.

b.  EM Construction represented to have an EIN of 55-3674988. This is the SSN for Em Phoeur. I know that if a business pays employees, it must have an EIN issued by the IRS and cannot use an SSN to file proper payroll forms with the IRS. The IRS has provided that the EIN listed on the application does

not exist and does not have a record of EM Construction filing any IRS 940 or 941 forms.

34. Investigators obtained and reviewed records from WFB for EM Construction x1845. This account was opened on or about January 27, 2020, in the name of Artem Zherdov DBA as EM Construction Co., with Zherdov listed as the company's sole owner, and a joint signer on the account with Phoeur EM. From when the account was opened on January 27, 2020 through May 7, 2020 there was minimal activity in the account. During this time period, a total of approximately $4,400 was deposited into this account. Money leaving the account went to places like grocery stores, liquor stores, and ATM withdrawals. On May 7, 2020, the account had a balance of approximately $821.94. Between May 8 and May 31, 2020, $452,738 was deposited into the account, which included two deposits totaling $243,938 which referenced PPP loans, one deposit in the amount of $113,800 from the SBA, one deposit in the amount of $4,000 from the SBA, and two transfers from a savings account totaling $91,000 ($243,938 + $113,800 + $4,000 + $91,000 = $452,738). The government's investigation determined the deposit for $113,800 was the loan proceeds for the fraudulently obtained EIDL loan for EM Construction described above and the transfers from savings totaling $91,000 were virtually all funded with the deposits that referenced PPP Loans which were transferred to the savings account. Investigation continues regarding the other deposits which referenced PPP loans and the SBA.

18

35.   On July 28, 2020 WFB EM Construction x1845 had a balance of $2,377.78, before on July 29, 2020, the account had a deposit of $149,900 from the SBA.  No other funds came into the account before August 10, 2020, when check number 1020 in the amount of $60,000, made payable to Pro Active Home Health, cleared the account.  That check was deposited into SUBJECT ACCOUNT 1 on August 10, 2020.  Investigation determined the deposit from the SBA on July 29, 2020 was the loan proceeds from the fraudulently obtained EM Construction EIDL loan described above.

**ABC Realty Advisors Inc. ("ABC Realty") fraudulent loan application – funds transferred in part to SUBJECT ACCOUNT 1**

36.   ABC Realty applied for a PPP loan through BOA on or about April 16, 2020. Arsen Dadyan, who is known to investigators as DADYAN'S brother, was listed as the applicant for the ABC Realty PPP loan. On or about May 1, 2020, the loan was approved and BOA sent $117,938 to an account at BOA in the name of ABC Realty ending x2061 ("BOA ABC Realty x2061"). The government's investigation has revealed that the PPP application contained numerous false and fraudulent representations. For example:

a.   ABC Realty submitted a 2019 IRS Form 940 that represented to have made $589,623 payments to employees during 2019. The IRS has provided that ABC Realty has in fact never filed an IRS Form 940.

b.   ABC Realty also submitted a 2020 IRS Form 941 that represented that eight individuals were employed for the

first quarter of 2020 and were paid $151,842. The IRS has provided that ABC Realty has in fact never filed an IRS Form 941.

      c.  I reviewed records provided by the California Employment Development Department ("CA EDD") and learned that no records existed of ABC Realty ever having any employees.

      37.  Investigators obtained and reviewed records from BOA for BOA ABC Realty x2061.  This account was opened on or about March 7, 2017 in the name of ABC Realty Advisors Inc. with DADYAN listed as the company's President and the sole signer on the account.  On May 1, 2020, the account had a balance of $615.25.  No other deposits came into the account before on May 4, 2020 a deposit in the amount of $117,938 came into the account which referenced "Cares Act Paycheck Protection Program".  Between May 5, 2020 and November 17, 2020, other deposits of $198,020 came into the account, for total deposits of $315,958 between May 1, 2020 and November 17, 2020.  On November 17, 2020 the account wired $84,600 to SUBJECT ACCOUNT 1.  Investigation determined that the $117,938 deposit on May 4, 2020, was the loan proceeds from the fraudulently obtained PPP loan obtained by ABC Realty described above.

**Green Label Nutrients ("Green Label") fraudulent loan application – deposited into SUBJECT ACCOUNT 2 then funds transferred in part to SUBJECT ACCOUNT 1**

      38.  Green Label applied for a $150,000 EIDL loan on or about May 29, 2020. The applicant and 100% owner of Green Label was listed as DADYAN. On or about July 20, 2020, the application was approved and $150,000 was deposited into SUBJECT ACCOUNT 2.

The government's investigation has revealed that the EIDL application contained numerous false and fraudulent representations. For example:

a.   Green Label represented to have been in operation since October 7, 2015. Law enforcement reviewed publicly available records from the California Secretary of State and could find no record of Green Label listed.

b.   Green Label represented to have 11 individuals employed for the 12 months leading up to January 31, 2020. Green Label represented to have an Employee Identification Number ("EIN") of 61-2105827. This appears to be a variation of DADYAN's SSN, 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. I know that employers need a valid EIN to properly report employee payments to the IRS. The IRS has provided that the EIN for Green Label was in fact 85-0971567 and was only issued on May 7, 2020. The IRS has also provided that no IRS Forms 940 or 941 were on file for Green Label.

39.   Law enforcement interviewed Bank of the West ("BOTW") personnel and learned that DADYAN was questioned about receiving $150,000 into a personal bank account. DADYAN told BOTW personnel that Green Label had been in operation for a long time. DADYAN was asked by BOTW personnel to provide documentation supporting this claim but has yet to provide the requested documentation.

40.   The investigation has also determined, as further described below, $20,000 of the proceeds deposited into SUBJECT ACCOUNT 2 were transferred to SUBJECT ACCOUNT 1.

**Summary of SUBJECT ACCOUNT 1**

41.   Investigators obtained and reviewed records from BOTW for SUBJECT ACCOUNT 1.  This account was opened on or about June 23, 2020, in the name of Pro Active Home Healthcare Inc. with DADYAN listed as the sole signer on the account.  From June 23, 2020 (account opening date) through November 16, 2020, $261,525 was deposited into the account, of which approximately $189,430.85 was traced to being proceeds of the wire fraud scheme described in this affidavit.  These deposits included the following:

| Date of Deposit | Amount of Deposit | Deposit from |
|---|---|---|
| 6/25/2020 | $50 | BOTW x5535 |
| 7/20/2020 | $96,875 | Runyan Tax[2] |
| 8/10/2020 | $60,000 | EM Construction |
| 11/16/2020 | $20,000 | SUBJECT ACCOUNT 2[3] |
| 11/16/2020 | $84,600 | ABC Realty |
| TOTAL = | **$261,525** | |
| | | |

Disbursements during the same time-period totaled approximately $964.00, of which $600 was a payment to a shoe repair store.  As of November 16, 2020, the account had a balance of approximately $260,561.

---

[2] Traced to proceeds of the New Acre loan and the Voyage Limo loan which were comingled with each other and with other sources before being transferred in part to SUBJECT ACCOUNT 1.

[3] Traced to proceeds of the Green Label loan which was deposited into SUBJECT ACCOUNT 2.

**Summary of SUBJECT ACCOUNT 2**

42.   Investigators obtained and reviewed records from BOTW for SUBJECT ACCOUNT 2.  This account was opened on or about May 28, 2020, in the name of DADYAN with DADYAN listed as the sole signer on the account.  From May 28, 2020 through November 16, 2020, $150,049.03 was deposited into the account, of which $149,900, or 99.9% of all deposits into the account during this time period, came from a July 20, 2020 deposit in the amount of $149,900 from the SBA.  Investigation determined this deposit was the loan proceeds for the fraudulently obtained Green Label EIDL loan described above.  No other deposits were made into SUBJECT ACCOUNT 2 before November 16, 2020, at which time $20,000 was transferred from SUBJECT ACCOUNT 2 to SUBJECT ACCOUNT 1.  Based on the fact that the deposits into SUBJECT ACCOUNT 2 were virtually all from the fraudulently obtained Green Label EIDL loan, the $20,000 transferred to SUBJECT ACCOUNT 1 represents proceeds of the loan fraud scheme described in this affidavit. In addition, funds up to $129,900 in SUBJECT ACCOUNT 2 ($149,900 of fraudulently obtained loan proceeds deposited into SUBJECT ACCOUNT 2 minus the $20,000 transferred to SUBJECT ACCOUNT 1) also represent proceeds of the wire fraud scheme.

43.   Disbursements from SUBJECT ACCOUNT 2 primarily consisted of a cashier's check in the amount of $100,000 made payable to AM & AM Financial Services Inc. which cleared the account on September 17, 2020, and the $20,000 transfer to

SUBJECT ACCOUNT 1.  As of November 16, 2020, the account had a balance of approximately $3,078.25.

44.  Based on my training and experience, I know that persons engaged in money laundering frequently engaged in the following acts:

a.   Using the identities of other persons to establish bank accounts in order to conceal the interests of the perpetrators in the criminal proceeds, as was done with the use of Than P Tran's identity outlined in paragraph 19 above.

b.   Use of the identities of relatives such as Vahe Dadyan, as outlined in paragraph 26 above.

c.   Transfer of fraud proceeds between and among bank accounts in order to conceal the source and ownership of the fraud proceeds, as outlined in paragraphs 40 and 41 above.

### V.  <u>CONCLUSION</u>

45.  The evidence set out in this affidavit demonstrates that there is probable cause to believe that during the time period May 2020 through November 2020, fraudulent loan applications were submitted to financial institutions and the SBA, in the names of New Acres, Voyage Limo, EM Construction, ABC Realty, and Green Label, in an attempt to obtain funds authorized by the CARES Act.  Based on the fraudulent loan applications submitted, these entities received proceeds of PPP and EIDL loans which were either directly or indirectly transferred to SUBJECT ACCOUNTS.  SUBJECT ACCOUNT 1 received loan proceeds from at least five fraudulently obtained loans through transfers amongst various accounts held by multiple

individuals and was involved in money laundering concealment transactions.  SUBJECT ACCOUNT 2 received at least $149,900 of fraudulent loan proceeds for one loan obtained directly by DADYAN of which $20,000 of these proceeds were subsequently transferred to SUBJECT ACCOUNT 1.

1.   Based on the foregoing, there is probable cause to believe that SUBJECT FUNDS constitute or were derived from proceeds traceable to one or more violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344 (Bank Fraud), and 18 U.S.C. § 1956 (a)(1)(B)(i) (money laundering concealment), and are therefore subject to seizure pursuant to 18 U.S.C. § 981(b), and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 984.  In addition, there is probable cause to believe that the SUBJECT FUNDS are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 982(a)(7) and 21 U.S.C. 853(f), because the funds would, in the event of conviction on the alleged underlying offenses, be subject to forfeiture, and an order under section 21 U.S.C. § 853(e) would not be sufficient to assure the availability of the property for forfeiture.

_____
JUSTIN PALMERTON
Special Agent
FEDERAL BUREAU OF
INVESTIGATION

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
January 2021.


_____
HONORABLE _____
UNITED STATES MAGISTRATE JUDGE

26